

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Dr. Rafael A. Santiago Aponte, María Otero Suria, por sí y en representación de la Sociedad legal de Gananciales que tienen constituida<br><br>Peticionarios<br><br>v.<br><br>Dra. Maribel Rodriguez Martínez, Víctor Oppenheimer, por sí y en representación de la Sociedad Legal de Gananciales que tienen constituida; Dr. Javier Cuevas Marrero, Fulana de Tal, por sí y en representación de la Sociedad Legal de Gananciales que tienen constituida; Zutano y Mengano;  Emergency & Pediatric Specialists of Puerto Rico, P.S.C.<br><br>Recurridos | Certiorari<br><br>2011 TSPR 37<br><br>181 DPR _____ |

Número del Caso: CC-2009-1022

Fecha: 18 de marzo de 2011

Tribunal de Apelaciones:

Región Judicial de San Juan

Juez Ponente:

Hon. Emmalind García García

Abogado de la Parte Peticionario:

Lcdo. José A. Cuevas Segarra

Abogados de la Parte Recurrida:

Lcdo. César T. Alcover
Lcda. Rhaiza Vélez-Plumey

Materia: Injuction

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Dr. Rafael A. Santiago Aponte, María Otero Suria, por sí y en representación de la Sociedad legal de Gananciales que tienen constituida<br><br>Peticionarios<br><br>v.<br><br>Dra. Maribel Rodríguez Martínez, Víctor Oppenheimer, por sí y en representación de la Sociedad Legal de Gananciales que tienen constituida; Dr. Javier Cuevas Marrero, Fulana de Tal, por sí y en representación de la Sociedad Legal de Gananciales que tienen constituida; Zutano y Mengano; Emergency & Pediatric Specialists of Puerto Rico, P.S.C.<br><br>Recurridos | CC-2009-1022 |

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 18 de marzo de 2011.

Se nos solicita la revocación de una sentencia del Tribunal de Apelaciones. Allí se confirmó al Tribunal de Primera Instancia, Sala de San Juan, que desestimó el reclamo de la parte peticionaria, el doctor Rafael Santiago Aponte, la señora María Otero Suria, y la sociedad legal de bienes gananciales que ambos componen, para que se les reconozca como accionistas de la corporación Emergency & Pediatric Specialists of Puerto Rico, P.S.C. (EPSPR).

Por entender que los acuerdos a los que llegaron las partes, y sus actos, convirtieron al peticionario en accionista de la corporación, revocamos. No es posible que exista una corporación con fines de lucro sin accionistas. Concluir lo opuesto contraviene la derogada Ley General de Corporaciones, Ley Núm. 144 de 10 de agosto de 1995,[1] 14 L.P.R.A. secs. 2601 y *ss*, aplicable a este caso, y los pormenores de los acuerdos a los que llegaron las partes.

I

Los doctores recurridos, Maribel Rodríguez Martínez, Javier Cuevas Marrero y el peticionario, se reunieron el 14 de diciembre de 2005 para ultimar los detalles de la corporación que sucedería al Grupo Emergencias Pediátricas A&J. Esta corporación prestaba el servicio expreso de emergencias pediátricas al Hospital Auxilio Mutuo. Se desprende de la minuta de esa reunión que surgió la necesidad de incorporar una nueva entidad, bajo un nuevo nombre, ante la llegada de socios adicionales. Se seleccionó Emergency & Pediatric Specialists (EPSPR) como la primera opción de nombre para la nueva corporación.

Además, consta en la minuta que la participación de los tres galenos en la corporación a crearse sería de un

---

[1] Como los hechos ocurrieron durante la vigencia de la derogada Ley Núm. 144, nos concentraremos en su análisis, y no en el de la nueva Ley General de Corporaciones, Ley Núm. 164 de 16 de diciembre de 2009. Sin embargo, en este aspecto, el análisis es igual para ambos estatutos.

30% para cada uno, lo que sumaba un 90% de las acciones. El restante 10% se reservaría como ahorro o por si surgía algún otro socio. Ese día también se acordó una paga de $7,000 mensuales para los doctores Cuevas Marrero y Santiago Aponte y de $9,000 para la doctora Rodríguez Martínez, adicionales a lo que devengaran por los turnos de trabajo. Los doctores Rodríguez Martínez y Santiago Aponte, quienes se identificaron como presidenta y secretario, respectivamente, firmaron la minuta.

EPSPR se incorporó como una corporación de servicios profesionales el 20 de diciembre de 2005. El propósito que reza su certificado de incorporación es prestar servicios pediátricos de emergencia a instituciones hospitalarias. El doctor Santiago Aponte figuró como su incorporador, y el doctor Cuevas Marrero como agente residente. Además, ambos constan como directores de la corporación, junto con la doctora Rodríguez Martínez. Según el certificado de incorporación, los tres galenos fungirían como directores hasta la primera reunión anual de accionistas o hasta que sus sucesores les reemplazaran. Se informó ante el Departamento de Estado que la corporación emitiría 100 acciones por el valor de $100 cada una.

En la primera reunión de la Junta de Directores de EPSPR, el 20 de enero de 2006, se escogió a la doctora Rodríguez Martínez como presidenta, al doctor Santiago Aponte como secretario, y al doctor Cuevas Marrero como

tesorero de la corporación. Ese día también se aprobó una moción para que los tres oficiales corporativos electos, a quienes se les reconoció como accionistas, condujeran todos los asuntos de la corporación sin la necesidad de otro cuerpo de gobierno.[2]

Además, la nueva Junta de Directores de EPSPR acogió una resolución para emitir y vender el 90% de las acciones a los tres galenos, a razón de 30% para cada uno, a $100 por acción,[3] conforme a lo acordado. También se aprobaron, mediante resolución, los estatutos corporativos. Los acuerdos mencionados obtuvieron el aval unánime de los directores, según consta en la minuta que

---

[2] En lo pertinente, la minuta lee:
> "On motion duly made seconded and unanimously carried, it was authorized that the affairs of this corporation will be conducted directly by the above detailed officers, which are also its stockholders and directors, without the need of any other governing body. From here on as a group they will be named and referred to its [sic] the Board of Directors."

[3] En ese extremo, la minuta de la reunión lee:
> "On motion duly made, and [sic] unanimously carried, the following resolution was adopted:
>> RESOLVED, a proposal is adopted to issue and sell ninty [sic] (90) shares of common stock, thirty (30) to each of the previously detailed share holders at a price of one hundred ($100.00) per share and to issue, and that the Board of directors be, and hereby is, authorized to, from time to time, at its discretion, issue additional shares of common stock up to the total authorized amount by the By-Laws as amended, under the terms and conditions deemed appropriate and under the laws of the commonwealth of Puerto Rico."

firmó el doctor Cuevas Marrero, quien presidió la primera reunión de la Junta, y el señor Thomas J. Bryan, quien actuó como secretario por invitación.

Se imprimieron tres certificados de acciones fechados ese mismo día, 20 de enero de 2006, a nombre de cada uno de los doctores. Cada certificado representa 30 acciones a $100 cada una, que se dan por pagadas. Sin embargo, ninguno de los certificados está firmado. Una hoja de un libro corporativo reconoce a los tres médicos como accionistas y hace mención de los tres certificados como emitidos ese día, pero no se reconocen como pagados.

El 22 de febrero de 2006 la corporación otorgó un contrato con el Hospital Español Auxilio Mutuo de Puerto Rico para prestarle servicios médicos profesionales de emergencias pediátricas. En aras de financiar las operaciones de la empresa, los tres galenos ofrecieron sus bienes personales, solidariamente, como garantía para obtener una línea de crédito de Oriental Bank & Trust, ascendente a $100,000.

En el expediente del caso constan varias minutas de las reuniones de los directivos de EPSPR en que se tratan diferentes asuntos administrativos. Todas constan como preparadas por la presidenta, la doctora Rodríguez Martínez, y firmadas, además, por el doctor Santiago Aponte, como secretario. Las reuniones contaban con la asistencia del doctor Cuevas Marrero.

El 27 de noviembre de 2006, el doctor Santiago Aponte envió un correo electrónico a los doctores Rodríguez Martínez y Cuevas Marrero en que expresó su molestia porque tomaban decisiones sobre sus responsabilidades sin consultarle, a pesar de ser socio en igual jerarquía que ellos. Además, se atribuyó formar el grupo de emergenciólogos que atendían en sala de emergencias y contribuir a la corporación en todo lo que había sido necesario.

En la misma comunicación, el doctor Santiago Aponte describió el acuerdo al que habían llegado para que él pudiera ser socio con igual cantidad de acciones que los otros dos galenos. Consistía en que los tres garantizarían la línea de crédito obtenida y, además, él tendría que pagar $25,000 por participar del negocio. El pago de esos $25,000 se diferiría hasta el momento en que la corporación estuviera en condición de desembolsarle los dividendos que le correspondieran. Además, el doctor Santiago Aponte recibiría una compensación de $10,000 mensuales, que se redujo a $7,000 mensuales, por falta de dinero en la corporación. De igual forma, Cuevas Marrero y Rodríguez Martínez tuvieron que reducir su compensación en $3,000 mensuales, a $7,000 y $9,000, respectivamente, describió.

La doctora Rodríguez Martínez contestó el correo electrónico el 29 de noviembre de 2006. Respondió que esperaba que sus inquietudes se discutieran en la reunión

que sostendrían esa tarde. De la minuta de esa reunión, a la que asistieron los tres miembros de la Junta de Directores de EPSPR, surge que se acordó aumentar el pago por los servicios profesionales de los doctores Cuevas Marrero y Santiago Aponte a $10,000.

En el expediente del caso, varias minutas de reuniones evidencian que el doctor Santiago Aponte tuvo participación en dar seguimiento a la facturación de servicios a los planes médicos. Sostuvo diversas reuniones con la primera facturadora, Leydimar León, y quien sustituyó sus servicios, Muriel Martínez Montero, de la empresa Med Bill Services, Inc., y el doctor Cuevas Marrero. Las minutas de esas reuniones están fechadas entre junio 2006 y julio de 2007. También surge del expediente que el doctor Santiago Aponte se encargó del reclutamiento de emergenciólogos y la asignación de sus turnos de trabajo.

En una reunión que se celebró el 3 de agosto de 2007, los doctores Rodríguez Martínez y Cuevas Marrero informaron al doctor Santiago Aponte que "por la situación económica de la Corporación no es viable que continúe su participación como socio de la Corporación y a [sic] los privilegios de Esta [sic]". Se le ofreció continuar con su trabajo como emergenciólogo durante dos meses, "en lo que consigue otro trabajo", y se le invitó a que "ponga precio a la terminación de esta relación". En la minuta de la reunión se hizo constar que el

peticionario entendía que, por la situación económica de la corporación, no se habían pagado dividendos. Además, se reconoció que ninguno de los accionistas había hecho pagos por concepto de las acciones asignadas. Apéndice del Recurso, Págs. 37 y 148.

En la minuta de la siguiente reunión, celebrada el 9 de agosto de 2007, se indica que el doctor Santiago Aponte "aceptó desvincularse de la corporación como oficial" y que dejaría de trabajar como emergenciólogo el 1 de septiembre de 2007. En el documento se tachó una frase que leía que el doctor Santiago Aponte también aceptaba desvincularse como accionista. Esa tachadura tiene las iniciales de los doctores Rodríguez Martínez y Santiago Aponte.

El doctor Cuevas Marrero informó en esa reunión que gestionaría con el abogado la terminación de la participación del doctor Santiago Aponte en la corporación. De igual forma, tramitaría su liberación de la garantía que prestó para la obtención de la línea de crédito con Oriental Bank & Trust. Esa liberación ocurrió el 26 de septiembre de 2007.

La parte demandada presentó un documento titulado Acuerdo de Renuncia a Participación Corporativa, que tenía como propósito desvincular al doctor Santiago Aponte de la corporación. Sin embargo, el documento no está firmado ni precisa qué día del mes de agosto del 2007 estaba supuesto a firmarse. En ese documento

aparecen como comparecientes los tres doctores miembros de la Junta de Directores. El inciso (1) del documento indica que "[l]os comparecientes en este acuerdo componen la totalidad de los accionistas de Emergency & Pediatric Specialists of Puerto Rico, P.S.C.". Además, en sus incisos (2) y (3) se hace referencia a "los demás accionistas" para referirse a los doctores Cuevas Marrero y Rodríguez Martínez. En la parte en que se suponía firmaran los tres galenos, se identifica al doctor Santiago Aponte como accionista.

Entre otras cosas, el doctor Santiago Aponte reconocía en ese borrador de acuerdo que no hizo aportación económica a la corporación porque no se emitieron los certificados de acciones. En ese momento, la corporación operaba con su cuenta de reserva y no estaba en posición de distribuir dividendos, indica el documento.

La parte demandada acepta que hubo un acuerdo que permitía al doctor Santiago Aponte pagar los $25,000 con los dividendos que le correspondieran de la distribución que eventualmente hiciera la corporación. Además, los doctores Rodríguez Martínez y Cuevas Marrero aceptan que tampoco han pagado por las acciones que se les asignó en la resolución de la Junta de 20 de enero de 2006.

Los peticionarios presentaron una demanda el 18 de octubre de 2007. Solicitaron un interdicto preliminar y permanente, sentencia declaratoria, y daños y perjuicios.

Alegaron que los demandados les privaron de su propiedad y derechos como accionistas, en violación de la Ley General de Corporaciones y del debido proceso de ley contractual. Los demandados pidieron la desestimación. Argumentaron que el doctor Santiago Aponte no era accionista de la corporación porque nunca pagó por las acciones.

El Tribunal de Primera Instancia, Sala de San Juan, concluyó el 24 de octubre de 2008 que el demandante no era accionista porque no pagó el valor de las acciones; que su desvinculación como secretario de la corporación fue voluntaria; y que realizó funciones administrativas para la corporación por las que no recibió remuneración. En su resolución, desestimó la solicitud de injunction, pero refirió el pleito a una sala de lo civil para que evaluara si era acreedor de una compensación económica ante la posibilidad de que se le hubiera despedido en violación del debido proceso contractual y por el trabajo que realizó como promotor de la corporación. Inconforme, el doctor Santiago Aponte acudió al foro apelativo intermedio.

El Tribunal de Apelaciones confirmó al foro de primera instancia el 30 de octubre de 2009. Concluyó que ninguno de los galenos pasó a ser accionista de la corporación porque no pagaron por las acciones. Estimó como determinante el hecho de que ninguno de los

certificados de acciones fuera entregado. Así resolvió que se trata de una corporación sin accionistas.

El 7 de mayo de 2010 expedimos el auto de *certiorari*. Con el beneficio de los alegatos de las partes, procedemos a resolver.

II

Las leyes corporativas son un instrumento que utilizan los gobiernos para estimular el desarrollo empresarial y económico. Exposición de Motivos de la Ley Núm. 144, supra; Exposición de Motivos de la Ley General de Corporaciones, Ley Núm. 164 de 16 de diciembre de 2009, 14 L.P.R.A. secs. 3501 y *ss*. La figura de la corporación facilita el desarrollo de empresas porque se le reconoce una personalidad jurídica distinta a la de sus dueños o miembros, quienes por lo general no responderán con sus bienes personales por los actos de la corporación, sino hasta el monto de su inversión. C.E. Díaz Olivo, Corporaciones, Puerto Rico, Publicaciones Puertorriqueñas, 2005, pág. 11.

El ordenamiento reconoce varios tipos de corporaciones, y la Ley General de Corporaciones de 1995, al igual que la vigente Ley General de Corporaciones de 2009, supra, recoge algunos de ellos. Aunque se concentra principalmente en las corporaciones con fines de lucro, la Ley General de Corporaciones de 1995 dedicaba uno de sus capítulos, el XXII, 14 L.P.R.A. secs. 3421a y *ss*, a

establecer las diferencias de las corporaciones sin fines de lucro.

En términos generales, las corporaciones sin fines lucrativos carecen de autorización en ley para emitir acciones. Art. 19.04, 14 L.P.R.A. sec. 3421c. Sus ingresos, si alguno, no pueden distribuirse entre sus miembros, directores y oficiales. González v. Alicea, 132 D.P.R. 638, 650 (1993). Si llegaran a generar ganancias, por lo general, se reinvierten en alcanzar el propósito de la corporación. Art. 19.02, 14. L.P.R.A. sec. 3421a; L.M. Negrón Portillo, Derecho Corporativo Puertorriqueño, Segunda ed., 1996, págs. 7 y 256. Por consiguiente, las corporaciones sin fines de lucro no tienen accionistas. En su lugar, pueden optar por tener miembros si así se establece en el certificado de incorporación o en sus estatutos corporativos. Art. 19.05, 14 L.P.R.A. sec. 3421d.

Por otro lado, las corporaciones con fines lucrativos se dedican a hacer negocios y se caracterizan por repartir las ganancias entre sus accionistas. Negrón Portillo, op cit., pág. 6. El accionista es un propietario de la corporación con fines de lucro. Quien sea titular de las acciones de una corporación posee una parte alícuota de su capital, un derecho general a participar de sus ganancias y la distribución de sus activos en caso de liquidación. Díaz Olivo, op cit., pág. 148. "Una acción es un interés o cuota perteneciente al

accionista individualmente en la propiedad de la corporación". <u>López Martínez v. Yordán</u>, 104 D.P.R. 594, 596 (1976).

Cuando una corporación con fines de lucro está por crearse, sus acciones se adquieren mediante un contrato de suscripción. También se adquieren por contrato de suscripción acciones de una corporación existente, que proyecta emitir acciones nuevas. Negrón Portillo, <u>op cit.</u>, pág. 254.

El contrato de suscripción de acciones se diferencia de un contrato de compra y venta de acciones en que se trata de acciones por emitirse o crearse, y no de la transferencia de titularidad de unas acciones ya existentes de una corporación. El contrato debe indicar, al menos de forma general, la naturaleza y propósito principal de la corporación a crearse, el capital autorizado, el tipo y número de acciones autorizadas, y la clase, el valor y la cantidad de acciones relacionadas a la suscripción. 4 <u>Fletcher Cyc Corp.</u>, Sec. 1363.10 (2005), pág. 25-26.

> Conforme sostiene la jurisprudencia, un contrato de suscripción de acciones es similar a cualquier otro contrato. Si existe una causa válida, la conjunción de voluntades y un objeto lícito, el contrato queda perfeccionado. No es necesario que conste por escrito, a menos que la carta constitutiva de la corporación, su reglamento o las leyes del estado así lo requieran.

<u>Progreso Financiero, Inc. v. Gómez</u>, 55 D.P.R. 850, 853 (1940).

El Art. 5.17 de la Ley General de Corporaciones de 1995, 14 L.P.R.A. sec. 2777, especifica que un contrato de suscripción de acciones tiene que constar por escrito para que pueda hacerse valer contra un suscriptor. Los términos de una suscripción son irrevocables, salvo que conste el consentimiento de todos los suscriptores o de la corporación". Art. 5.16, 14 L.P.R.A. sec. 2776. Un suscriptor de acciones puede tener obligaciones y derechos como accionista, dependiendo de la ley, los estatutos corporativos o el acuerdo de suscripción. Fletcher Cyc Corp., supra, Vol. 4, Sec. 1375, págs. 49-52.

La doctrina de actos propios impide a los suscriptores, accionistas y corporaciones negar la validez de una suscripción que aceptaron, aunque ésta incumpla con las formalidades requeridas por la ley y los estatutos corporativos, a menos que ese incumplimiento haga de la suscripción una absolutamente nula. Si una corporación reconoció a un suscriptor como un accionista, estará impedida de negar su suscripción. Fletcher Cyc Corp., supra, Vol. 4, Sec. 1969, págs. 754-755.

La raíz de la doctrina de actos propios se encuentra en el principio general de Derecho que exige el proceder de buena fe. A nadie le es lícito obrar en contra de sus actos. Tampoco puede asumir una conducta contradictoria a una actuación previa que generó expectativas en quien confió en ese obrar. Vivoni Farage v. Ortiz Carro, Op. de

28 de septiembre de 2010, 2010 T.S.P.R. 206, 2010 J.T.S. 215, 179 D.P.R. ___ (2010); Prado Santos v. Stella Arroyo, 145 D.P.R. 816, 829 (1998); Int. General Electric v. Concrete Builders, 104 D.P.R. 871, 876 (1976).

La junta de directores de una corporación determina la forma en que se pagará por la adquisición de las acciones. El Art. 5.02 de la Ley General de Corporaciones de 1995, 14 L.P.R.A. sec. 2762, precisaba que el pago se hará con dinero en efectivo, servicios prestados, bienes muebles, bienes inmuebles, alquiler de bienes inmuebles o una combinación de las anteriores. Los tratadistas coinciden en que, cuando se habla de servicios prestados en este contexto, se hace referencia a servicios realizados en el pasado, no servicios que se prestarán en el futuro. Díaz Olivo, op cit., pág. 159; Negrón Portillo, op cit., pág. 235. El Art. 5.02 de la Ley General de Corporaciones de 2009, 14 L.P.R.A. sec. 3582, presenta un lenguaje más amplio al señalar que se pueden pagar las acciones, además, con "cualquier otro beneficio para la corporación".

Además, las acciones se pueden adquirir mediante pagos parciales o, incluso, fiarse. Negrón Portillo, op cit., pág. 236. "Toda corporación podrá emitir la totalidad o cualquier parte de sus acciones como acciones parcialmente pagadas las cuales estarán obligadas por el balance del precio que haya de pagarse por las mismas". Art. 5.07, 14 L.P.R.A. sec. 2767.

Esos pagos parciales pueden hacerse mediante cualquiera de los mecanismos de pago que reconoce el Art. 5.02 de la Ley General de Corporaciones de 1995, supra. Es decir, pueden hacerse con dinero en efectivo, servicios prestados, bienes muebles, bienes inmuebles, alquiler de inmuebles o una combinación de éstos. Una acción que se adquiere mediante pagos parciales también se conoce como una acción a precio aplazado. Díaz Olivo, op cit., pág. 162.

Las ganancias de una corporación se distribuyen entre sus accionistas en forma de pagos que se conocen como dividendos. Una corporación paga dividendos cuando hay un sobrante o ganancia, pero una corporación puede tener ganancias y optar por no pagar dividendos. Díaz Olivo, op cit., pág. 164; Negrón Portillo, op cit., pág. 256. La decisión de pagar dividendos recae en el buen juicio comercial de los directores de la corporación, a menos que los estatutos o artículos de incorporación impongan algún tipo de limitación. Los tribunales deben abstenerse de interferir con el buen juicio comercial en ausencia de fraude, mala fe u otro claro abuso de discreción. Fletcher Cyc Corp., supra, Vol. 11, Sec. 5325.

Entre los tipos de corporaciones con fines de lucro que reconocen la Ley General de Corporaciones de 1995 y la de 2009, se encuentran las corporaciones de servicios profesionales. Éstas sólo pueden organizarse para

practicar una profesión cuyo ejercicio exija una licencia como requisito de ley. Tienen que crearla uno o más individuos licenciados para ejercer la profesión para la cual se organizó, y sólo personas licenciadas pueden ser sus accionistas. Véanse Arts. 18.01 y 18.02, 14 L.P.R.A. secs. 3401 y 3402. Véanse, además, los Arts. 18.01 y 18.02 de la Ley General de Corporaciones de 2009, 14 L.P.R.A. secs. 3921 y 3922.

Al igual que la corporación regular, a la corporación profesional se le reconoce una personalidad distinta a la de sus accionistas. Sin embargo, tiene la particularidad de que la responsabilidad de éstos no se limita al monto de su inversión en la corporación si se trata de reclamaciones relacionadas con la actividad profesional regulada. La responsabilidad directa del profesional frente al cliente se mantiene. Art. 18.06, 14 L.P.R.A. sec. 3406. Además, si uno de los accionistas queda descalificado del ejercicio de la profesión, tiene que cesar su relación con la corporación. Art. 18.09, 14 L.P.R.A. sec. 3409; Díaz Olivo, op cit., pág. 359-361.

III

Del expediente del caso se desprende que la corporación y los otros galenos trataron a Santiago Aponte como accionista desde el comienzo de la entidad. Incluso, lo visualizaron como tal desde antes de que la corporación se inscribiera en el Departamento de Estado.

Por consiguiente, no pueden ahora ir contra sus propios actos y negarle ese reconocimiento.

Si no se hubiera reconocido al doctor Santiago Aponte como accionista, ¿cómo podría explicarse el acuerdo de que pagaría los $25,000 para saldar sus acciones con el dinero que obtuviera del pago de dividendos? Como define el derecho reseñado, los dividendos son la distribución de las ganancias de una corporación entre sus accionistas. No es posible que se paguen dividendos a una persona a quien no se le considera accionista. El mero hecho de que se acordara que el doctor Santiago Aponte participaría de la distribución de dividendos es un reconocimiento de que es accionista de la corporación.

La Ley General de Corporaciones de 1995 confiere a la Junta de Directores el poder de determinar la forma en que se pagarán las acciones, siempre y cuando el pago se haga en efectivo, servicios prestados, bienes muebles, bienes inmuebles, alquiler de bienes inmuebles o una combinación de éstos. Art. 5.02, supra. Además, la Junta tiene facultad para vender acciones a precio aplazado, es decir, acciones parcialmente pagadas. Art. 5.07, supra.

De los actos de la junta de directores de EPSPR se desprende una aceptación a que el doctor Santiago Aponte pagara parcialmente las acciones de la corporación con sus servicios. Aunque esa intención nunca se plasmó por escrito, de los actos de las partes no puede

interpretarse otra cosa. Sólo así podría explicarse que la corporación estuviera dispuesta a distribuirle dividendos con los que, a su vez, el galeno pagaría los $25,000 acordados. Cuando el pago de esos dividendos sumara $25,000, la deuda por el 30% de las acciones que se le asignó quedaría salda. A partir de ese momento adquiriría plenos derechos como accionista.

El reconocimiento del doctor Santiago Aponte como accionista se evidenció en varias instancias. En la primera reunión de la junta de directores, una vez se incorporó EPSPR, se aprobó unánimemente una resolución para emitir 90 acciones. Éstas se venderían a los accionistas Maribel Rodríguez Martínez, Rafael Santiago Aponte y Javier Cuevas, a razón de 30 acciones por accionista. Éstos pagarían $100 por acción. Eso contrasta con los $25,000 que se acordó que el doctor Santiago Aponte pagaría por su participación. Tampoco coincide con que pagara parte de las acciones con su servicio, pero sí armoniza con que el doctor Santiago Aponte tenía derecho al 30% de las acciones y que se le consideró como accionista desde ese momento.

Además, en el expediente consta una certificación en que se reconoce al peticionario como accionista. El doctor Cuevas Marrero firmó la certificación el 20 de enero de 2006 como presidente de EPSPR. Ése fue el día en que se celebró la primera reunión de la junta de directores, en la que el doctor Cuevas Marrero fungió

como presidente. El hecho de que el doctor Cuevas Marrero se limitara a firmar la carta que redactó el doctor Santiago Aponte no cambia el hecho de que, con su firma, avaló el contenido del documento.

En la minuta de la reunión de 9 de agosto de 2007 se tachó el dato de que el doctor Santiago Aponte aceptaba desvincularse como accionista, aunque sí aceptó apartarse como oficial de la corporación. En ese mismo encuentro, según consta en el documento, el doctor Cuevas Marrero se comprometió a gestionar la terminación de la participación del galeno peticionario como accionista. De ese compromiso se tiene que deducir un reconocimiento de que había que realizar gestiones adicionales para que el doctor Santiago Marrero dejara de figurar como accionista. De igual forma, hubo un borrador del acuerdo en que se le reconoció como accionista de la corporación.

Los demandados aducen que al doctor Santiago Aponte se le hicieron pagos mensuales por sus servicios. Bajo esa interpretación, no podría concluirse que las acciones quedaron parcialmente pagadas con el trabajo realizado. Sin embargo, se tiene que mirar el contrato entre las partes como un todo. El galeno prestó servicios como emergenciólogo, realizó tareas administrativas, participó como miembro de la junta de directores, de la que fue su secretario, y dio su firma para la obtención de la línea de crédito con la que EPSPR operó desde sus inicios. Todo este esfuerzo se le remuneró con los pagos mensuales. Las

gestiones en la promoción y organización de la corporación quedaron pagadas con titularidad parcial de las acciones, por las que además tendría que pagar $25,000.

Así pues, es evidente que desde antes de la incorporación de EPSPR, surgió entre las partes un contrato de suscripción por las acciones que eventualmente se emitirían. El contrato nació desde la primera reunión que sostuvieron los entonces futuros accionistas el 14 de diciembre de 2005. En esa reunión se reafirmó el propósito de la corporación a crearse, la cantidad de acciones que se emitirían cuando se creara la corporación, el precio que se pagaría por ellas y la cantidad de las acciones que adquirirían los presentes. Entre las partes había una causa válida, la conjunción de voluntades y un objeto lícito, requisitos en nuestro ordenamiento para que un contrato sea válido. Art. 1213 del Código Civil, 31 L.P.R.A. sec. 3391.

A menos que el incumplimiento con las formalidades por parte de la corporación hagan de la suscripción una totalmente nula, la corporación no puede contravenir sus actos. En este caso, es claro que la corporación está impedida, por sus propios actos, de negar al doctor Santiago Aponte el acceso al 30% de las acciones por los $25,000 pactados.

Además de los requisitos para que un contrato sea válido, el Art. 5.17 de la Ley General de Corporaciones

de 1995, _supra_, exigía que el acuerdo de suscripción de acciones se hiciera por escrito, para que pudiera hacerse efectivo en contra del suscriptor. Lo mismo requiere el Art. 5.17 de la Ley General de Corporaciones de 2009, 14 L.P.R.A. sec. 3597. Ahora bien, en este caso no se pretende hacer cumplir el contrato frente al suscriptor, sino que es el suscriptor quien quiere hacer cumplir su contrato frente a la corporación. Para esta situación, la letra de la ley no exige que el contrato sea escrito.

Los tribunales de inferior jerarquía concluyeron que, como el doctor Santiago Aponte no había hecho pago en efectivo por sus acciones, nunca pasó a ser accionista. Eso ignora que las acciones pueden pagarse con el trabajo realizado, como por ejemplo, el trabajo de promotor. Fue esa tarea de promoción de la corporación una de las que adujo el Tribunal de Primera Instancia para referir el caso a una sala de lo civil y determinar si hubo trabajo realizado que quedó pendiente de pago.

De igual forma, el Tribunal de Primera Instancia y el Tribunal de Apelaciones entendieron que, como los otros dos galenos no realizaron pagos por sus acciones, la corporación permanecía sin accionistas. En nuestro ordenamiento jurídico no es posible que una corporación con fines de lucro opere sin accionistas. Sería como un cascarón vacío, inutilidad que el ordenamiento no puede sancionar.

Nótese que no se trata de una corporación sin fines de lucro, que por lo general, carece de accionistas y no paga dividendos. Tampoco se trata de una corporación con fines de lucro en proceso de organización. Se trata de una corporación que ya estaba en plena operación y prestación de servicios al momento de los hechos que dieron origen a la demanda. Es preciso que las corporaciones en esa etapa tengan una estructura de accionistas a quienes se pueda responsabilizar, por ejemplo, en caso de que surja alguna de las causas para descorrer el velo corporativo.[4] Esta situación no se altera por el hecho de que se trate de una corporación profesional.

Como vimos, la Ley General de Corporaciones de 1995 requiere que las corporaciones profesionales sólo tengan profesionales licenciados como accionistas. El Art. 18.03, 14 L.P.R.A. sec. 3403, especifica que solamente "una o más personas, cada una de las cuales esté debidamente licenciada o de otra forma autorizada legalmente a prestar los mismos servicios profesionales" estarán autorizadas para incorporarse. La ley no

---

[4] Si bien es cierto que el velo corporativo sólo se descorrerá en situaciones excepcionales, los accionistas de una corporación están sujetos a responder personalmente en aquellos casos en que los bienes de la entidad sean insuficientes, y se pruebe que se utilizó la figura corporativa para sancionar un fraude, promover una injusticia, evadir una obligación estatutaria, derrotar la política pública, justificar la inequidad o defender un crimen. D.A.Co. v. Comunidad San José, Inc., 130 D.P.R. 782, 798 (1992).

contempla la posibilidad de que haya una corporación de servicios profesionales con menos de un accionista.

Además, el Art. 4.01(k) de la Ley General de Corporaciones de 1995, 14 L.P.R.A. sec. 2721(k), requiere que los directores sean destituidos por los dueños de una mayoría de las acciones con derecho a votar para elegir directores. Si la corporación no tenía accionistas, como argumentan los demandados, ¿cómo podría explicarse que se removiera al doctor Santiago Aponte de sus funciones como director de la corporación? Nuevamente, los actos de la corporación evidencian que a los tres galenos se les reconocieron prerrogativas de accionistas, aunque no hubieran pagado aún por la totalidad de las acciones.

Los tribunales de inferior jerarquía también dieron mucho peso a la inexistencia de certificados de acciones válidos. Si bien es cierto que los certificados de acciones sirven como evidencia, no son absolutamente determinantes para probar la titularidad de la acción. Fletcher Cyc Corp., supra, Vol. 11, Sec. 5094, págs. 62-63. Además, expedir el certificado de acción correspondía a la corporación, que no lo hizo. Reiteramos que la corporación no puede beneficiarse de su propia falta.

En conclusión, los actos de la corporación y de los otros accionistas convirtieron al doctor Santiago Aponte en accionista. Corresponde ahora que EPSPR tome las medidas para que se cumpla con el acuerdo que le daría plena titularidad sobre el 30% de las acciones. Es decir,

procede que el doctor Santiago Aponte pague los $25,000 de la distribución de dividendos, según acordaron las partes, para que adquiera la plena titularidad del 30% de las acciones. Con esa transacción, quedarían pagadas sus gestiones como promotor de la corporación. Aún está por verse si se le despidió como oficial de la corporación y emergenciólogo en violación de su contrato con la corporación.

IV

Por los fundamentos antes expuestos, revocamos la sentencia recurrida y ordenamos a EPSPR que reconozca al doctor Santiago Aponte como accionista de la corporación, en cumplimiento con el contrato que acordaron las partes para la adquisición del 30% las acciones de la corporación. Se devuelve el caso al Tribunal de Primera Instancia para que continúen los procedimientos de manera consistente con lo resuelto aquí, y se determine si hubo alguna violación en el despido del doctor Santiago Aponte como oficial y emergenciólogo de EPSPR.

Se dictará Sentencia de conformidad.

RAFAEL L. MARTÍNEZ TORRES<br>Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Dr. Rafael A. Santiago Aponte, María Otero Suria, por sí y en representación de la Sociedad legal de Gananciales que tienen constituida<br><br>Peticionarios<br><br>v.<br><br>Dra. Maribel Rodríguez Martínez, Víctor Oppenheimer, por sí y en representación de la Sociedad Legal de Gananciales que tienen constituida; Dr. Javier Cuevas Marrero, Fulana de Tal, por sí y en representación de la Sociedad Legal de Gananciales que tienen constituida; Zutano y Mengano; Emergency & Pediatric Specialists of Puerto Rico, P.S.C.<br><br>Recurridos | CC-2009-1022 |

SENTENCIA

En San Juan, Puerto Rico, a 18 de marzo de 2011.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, revocamos la sentencia recurrida y ordenamos a EPSPR que reconozca al doctor Santiago Aponte como accionista de la corporación, en cumplimiento con el contrato que acordaron las partes para la adquisición del 30% las acciones de la corporación. Se devuelve el caso al Tribunal de Primera Instancia para que continúen los procedimientos de manera consistente con lo resuelto aquí, y se determine si hubo alguna violación en el despido del doctor Santiago Aponte como oficial y emergenciólogo de EPSPR.

Lo acordó y ordena el Tribunal, y lo certifica la Secretaria del Tribunal Supremo.

Aida I. Oquendo Graulau
Secretaria del Tribunal Supremo